**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                    :
W.R. and K.R.,                      :   CIVIL ACTION NO. 09-2268 (MLC)
individually and o/b/o H.R.,        :
                                    :
     Plaintiffs,                    :      MEMORANDUM OPINION
                                    :
     v.                             :
                                    :
UNION BEACH BOARD OF                :
EDUCATION,                          :
                                    :
     Defendant.                     :
─────────────────────────────────  :
```

**COOPER, District Judge**

Plaintiffs, W.R. and K.R. (the "parents"), individually and on behalf of their minor son H.R. (collectively, "Plaintiffs"), brought this action under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. ("IDEA"), seeking to recover attorneys' fees and related costs as the prevailing party in an administrative proceeding.  (Dkt. entry no. 1, Compl.) Defendant counterclaimed, seeking reversal of the April 28, 2009 decision of an administrative law judge ("ALJ") in Plaintiffs' due process proceedings against Defendant.  (Dkt. entry no. 3, Answer & Countercl.; dkt. entry no. 16, 4-28-09 ALJ Decision.) The parties agreed to bifurcate the issue of attorneys' fees and costs, to be decided following resolution of the substantive educational issues raised in this matter.  (Dkt. entry no. 13, Joint Discovery Plan at 10.)  The Court denied Plaintiffs' motion for a preliminary injunction to provide specified educational

services on November 19, 2009.  (Dkt. entry no. 28, 11-19-09 Mem. Op.; dkt. entry no. 29, Order.)

Defendant now moves for judgment in its favor based on the record below, reversing the April 28, 2009 ALJ Decision insofar as it concluded that Defendant had not provided H.R. with a free appropriate public education ("FAPE").  (Dkt. entry no. 32.)  See 20 U.S.C. § 1401(9).  Plaintiffs cross-move for summary judgment. (Dkt. entry no. 33.)  The Court decides the motion and cross motion without oral argument, pursuant to Federal Rule of Civil Procedure ("Rule") 78.[1]  For the reasons stated below, the Court will grant Defendant's motion, deny Plaintiffs' cross motion, and reverse the decision of the ALJ to the extent she found Defendant had not provided H.R. with a FAPE.

**BACKGROUND**

H.R. is a fifth-grade student eligible for services under the IDEA and has been so classified since 2004.  He has been diagnosed with dyslexia, a mixed expressive/receptive language disorder, central auditory processing weakness, and attention deficit hyperactivity disorder, and is thus classified as "multiply disabled" under applicable New Jersey regulations.

---

[1] The Court held an oral hearing on November 5, 2009, in connection with Plaintiffs' motion for a preliminary injunction, during which the parties adequately presented the relevant issues in this case.  (See dkt. entry no. 27.)

(Dkt. entry no. 14, 5-19-08 Individualized Education Plan ("IEP") at 1; 4-28-09 ALJ Decision at 3.)[2]

The IEP originally proposed on June 6, 2007, for the 2007-08 school year would have placed H.R. in a self-contained classroom, in which H.R. would be taught all subjects in a small group of students by a special education teacher.  (4-28-09 ALJ Decision at 13; Admin. R. at 187, 213.)  Plaintiffs disagreed with the self-contained classroom placement, and a revised 2007-08 school year IEP discussed at an August 27, 2007 meeting placed H.R. in mainstream classes, except for "resource room replacement" classes for two forty-five minute sessions daily for both language arts literacy instruction and math.  (Admin. R. at 271, 295.)  This IEP was subsequently revised again on October 4, 2007, to place H.R. in a mainstream math class with an aide providing in-class support.  (Admin. R. at 379.)

Plaintiffs filed their first petition for due process in the New Jersey Office of Special Education Programs ("OSEP") on October 18, 2007, seeking review of the IEP proposed for the 2007-08 school year, which was H.R.'s third grade year.  (Dkt.

---

[2]  See N.J.A.C. § 6A:14-3.5(c)(6) ("'Multiply disabled' . . . means the presence of two or more disabling conditions, the combination of which causes such severe educational needs that they cannot be accommodated in a program designed solely to address one of the impairments.").

entry no. 33, Pl. Br. at 1.)[3]  Plaintiffs sought "an order for a daily reading programming for a [sic] least 50 minutes per day of a research based, multi-sensory and phonics based program."  (10-18-07 Due Process Pet., Agency Dkt. No. 2008-12945.)  Plaintiffs also requested an extended school year for five fifty-minute reading sessions per week.  (Id.)

OSEP transferred Plaintiffs' due process petition to the New Jersey Office of Administrative Law ("OAL") on December 18, 2007. The parties entered into a Consent Order providing for evaluations of H.R. and providing H.R. instruction in the Wilson Language program ("Wilson program").  During his third grade year, H.R. received language arts literacy instruction five days a week for eighty or ninety minutes in a resource room replacement with a special education teacher trained in the Wilson program, who also served as H.R.'s in-class aide in his other mainstreamed academic classes.  (4-28-09 ALJ Decision at 10-12.)  The resource room replacement class consisted of the teacher, an aide, and five or six other students.  (Id. at 10.)

Defendant proposed an IEP for the 2008-09 school year on June 19, 2008, which Plaintiffs rejected because it did not specify a particular reading program or the number of sessions

---

[3] The Administrative Record indicates that while Plaintiffs mailed the Request for Due Process for the 2007-08 school year on October 16, 2007, it was received and filed by OSEP on October 18, 2007.

per week.  (Admin. R. at 813, 829.)  Plaintiffs filed a second due process petition on August 14, 2008, as to the 2008-09 school year IEP.  (4-28-09 ALJ Decision at 2.)  The second due process petition sought the same relief proposed in Plaintiffs' first due process petition.  (7-16-08 Due Process Pet., Agency Dkt. No. 2009-13879.)

During the 2008-09 school year, H.R. received language arts literacy instruction in a resource room with five other students for ninety minutes daily.  (4-28-09 ALJ Decision at 15.)  He also received in-class support from an aide during his other classes.

The ALJ consolidated the two due process petitions and conducted fourteen days of hearings between October 2, 2008, and April 2, 2009.  The ALJ heard testimony from the following witnesses:

(1) Dr. Denise Aloisio, a neuro-developmental pediatrician who evaluated and diagnosed H.R. beginning in February 2005, and opined that H.R.'s reading impairment required a multi-sensory, empirically based phonics program;

(2) Karen Kimberlin, a speech-language pathologist specializing in reading who recommended two individualized speech therapy sessions per week, as well as intensive language and reading intervention;

(3) Teresa Bendix, a certified Wilson Reading System Instructor employed by Defendant in 2007 to instruct H.R. using the Wilson program, during which time Ms. Bendix opined that H.R. made very good progress in reading and writing;

(4)   W.R., father of H.R., who testified that H.R. made good
      progress using the Wilson program with Ms. Bendix but
      expressed concern that H.R.'s educational placement
      with a group of six children for resource room language
      arts instruction was holding H.R. back;

(5)   Nancy Hennessey, a special education learning
      disabilities consultant and certified Wilson program
      trainer who opined that H.R. made no progress in
      reading between 2004 and 2007, and believes that H.R.
      needs structured language program instruction either
      one-on-one for sixty minutes per day or with a
      homogenous group for ninety minutes per day;

(6)   Erica Nadel, a special education teacher in the Union
      Beach School District who taught H.R. in his second-
      grade special education class and was H.R.'s third-
      grade resource room replacement teacher for language
      arts and literacy.  Ms. Nadel was trained in the Wilson
      program and used Wilson concepts in constructing a
      curriculum for H.R. and opined that H.R. made progress
      in the 2007-08 school year because he read more, was
      more confident, worked more independently as well as
      cooperatively with peers, and knew more words by sight;

(7)   Susan Sarn, a Learning Disability Teacher Consultant
      ("LDTC") who has been H.R.'s case manager since his
      kindergarten year and prepared H.R.'s IEPs for the
      second, third, and fourth grades;

(8)   Jessica Bernstein, a special education teacher who
      teaches six students, including H.R., resource room
      language arts literacy for two ninety-minute periods
      daily, and acts as the in-class support teacher for
      four of these students in math, science, and social
      studies.  She modifies H.R.'s fourth-grade curriculum
      where appropriate and noted that he is doing well in
      his mainstreamed classes, is motivated, and has good
      attendance.  She is a certified Wilson program
      instructor and has been using the Wilson program in
      conjunction with other programs for the language arts
      resource room class.  Ms. Bernstein testified that H.R.
      is very happy in the language class and has made steady

progress in language arts literacy, as reflected by his
grades;

(9)   Charles Ehrlich, a reading and learning disabilities
      specialist whom Defendant sought as a consultant on
      H.R.'s reading program for the 2007-08 school year.
      Dr. Ehrlich opined that H.R. needs a multi-sensory,
      multi-faceted approach to literacy instruction, and
      that the Wilson program taught without variance would
      be inappropriate for H.R. due to his motivation issues.
      He created a multi-sensory reading program specifically
      for H.R. and met with H.R.'s teachers every month
      during the 2008-09 school year.

(4-28-09 ALJ Decision at 3-19.)

## I.   ALJ's Findings of Fact

The ALJ found that "[a]ll witnesses were credible,
qualified, experienced and well-intentioned to properly evaluate
and to help H.R. to read," but noted that she gave "more weight
to his hands-on daily educators." (Id. at 20.)  The ALJ rejected
Ms. Hennessey's opinion that H.R.'s reading ability was
regressing.  (Id.)  The ALJ accepted Ms. Nadel's testimony that
her use of Wilson and other techniques improved H.R.'s attitude,
participation, attention, and reading and writing ability, as
well as the ability to work independently and cooperatively with
peers.  (Id.)  The ALJ also credited Ms. Bernstein's testimony
that in the fourth grade, H.R. "made progress in every area and
continues to make steady progress in language arts literacy."
(Id. at 21.)

The ALJ made the finding that "H.R. has made progress in the
language arts literacy program," and that the 2007-08 and 2008-09

7

IEPs "were sufficiently reasonably calculated to provide H.R. with a free appropriate public education in the least restrictive environment." (Id. at 22.)  She noted that H.R.'s progress may have been slowed by the facts that he was not treated for his ADHD until the end of second grade and his parents rejected Defendant's proposal to place H.R. in a self-contained class for third grade.  (Id. at 23.)  The ALJ also found, however, that the slow pace of Wilson language instruction in the fourth grade in a group of six students "has not resulted in sufficient reading progress for H.R."  (Id.)  The ALJ found that the witnesses agreed that more intensive instruction, such as a 1:1 or 1:3 teacher-student ratio, would provide advancement at a more efficient pace.  (Id.)

The ALJ then concluded her factual findings by stating: "[D]espite all the educators' outstanding hard work and creative efforts . . . I FIND that H.R. has not made meaningful educational progress."  (Id. at 24.)

## II.  ALJ's Conclusions of Law

The ALJ stated that the evidence showed that while H.R. is intellectually capable of learning to read at a "functionally literate" sixth grade level, the testifying witnesses agreed that he remained at the first- to second-grade level in reading comprehension and ability.  The ALJ concluded that "[w]hile H.R. has made progress, it has not been sufficient since H.R. is still

reading at a first- or second-grade level.  As such, additional remedial measures are necessary."  (Id. at 31.)  The ALJ held that while H.R.'s parents could not dictate that Defendant provide H.R. instruction using the Wilson language program, taught with "fidelity to design," the parents had met their burden of proving by a preponderance of the evidence "that the district failed to provide H.R. with a free appropriate public education in the least restrictive environment in the 2007-08 and 2008-09 school years, in that the district has not provided meaningful educational benefit to H.R."  (Id.)

The ALJ ordered the school district to reform the IEP to

> provide one-on-one teacher-to-student intensive language arts literacy instruction for two forty-five-minute periods daily during the school year and in the extended school year for six weeks, plus a teacher aide in regular academic classes, and speech-language and occupational therapies as needed until H.R. can read at a functionally literate sixth-grade level.

(4-28-09 ALJ Decision at 32.)

## III. Subsequent Proceedings

Defendant revised H.R.'s 2008-09 IEP on May 4, 2009, in response to the ALJ's decision.  The revised IEP provided two forty-five minute periods of one-on-one intensive literacy instruction for the remainder of the 2008-09 school year. Defendant also offered Plaintiffs two forty-five minute periods of one-on-one intensive literacy instruction for six weeks in the extended school year during the summer of 2009, but the parents

9

declined because the school district proposed that the sessions be scheduled two hours apart, with no instruction in between. The parents arranged for private instruction during the summer.

For H.R.'s fifth grade year, which is the current school year, H.R. returned to the small group resource room setting for language arts literacy instruction. Plaintiffs filed a third due process petition in the OAL on August 14, 2009, challenging the 2009-10 school year IEP, which is currently pending. (Dkt. entry no. 19, 8-14-09 Due Process Request; dkt. entry no. 32, Def. Br. at 2 n.2.)

Plaintiffs applied to the OSEP seeking enforcement of the ALJ's decision for the 2009-10 school year, which the OSEP denied on the basis that the ALJ's decision applied to the 2007-08 and 2008-09 school years only. (11-19-09 Mem. Op. at 7.) Plaintiffs then sought emergent relief in the OAL on September 15, 2009, seeking an order that Defendant provide H.R. with 1:1 language arts literacy instruction "until H.R. can read at a functionally literate sixth-grade level" or until the due process petition for the 2009-10 school year could be resolved. (Id.) The OAL denied Plaintiffs' application for emergent relief on August 26, 2009, finding that it lacked jurisdiction to interpret the ALJ's April 28, 2009 decision. (Id.) That same day, Plaintiffs applied to this Court for a preliminary injunction, seeking 1:1 language arts literacy instruction. (Dkt. entry no. 7, Notice of Mot. for

Prel. Inj.)  This Court determined that the stay-put provisions of the IDEA did not provide for the relief sought, and that in any event, the ALJ's April 28, 2009 order was limited by its terms to the duration of the 2008-09 school year and 2009 extended school year.  (11-19-09 Mem. Op. at 11-12, 17-18.)  <u>See</u> 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518.

## DISCUSSION

**I.  Applicable Legal Standards**

**A.   IDEA**

The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education [("FAPE")]."  20 U.S.C. § 1400(d)(1)(A).  A FAPE is "an educational instruction 'specially designed . . . to meet the unique needs of a child with a disability,' § 1401(29), coupled with any 'related services' that are 'required to assist a child with a disability to benefit from [that instruction],' § 1401(26)(A)."  <u>Winkelman v. Parma City Sch. Dist.</u>, 550 U.S. 516, 524 (2007) (omission and alteration in original); <u>see generally</u> 20 U.S.C. § 1401(9).  The IEP is designed to effectuate a FAPE for the child.  <u>M.P. v. S. Brunswick Bd. of Educ.</u>, No. 07-5975, 2008 WL 5412915, at *2 (D.N.J. Dec. 23, 2008).

Compliance with the IDEA requires only that a student's IEP be "reasonably calculated to enable the child to receive educational benefits."  <u>Hendrick Hudson Cent. Sch. Dist. v.</u>

Rowley, 458 U.S. 176, 206-07 (1982).  The IDEA does not require that a school district provide services "sufficient to maximize each child's potential 'commensurate with the opportunity provided to other children.'" Id. at 198.  Appropriateness of an IEP "is judged prospectively so that any lack of progress under a particular IEP, assuming arguendo that there was no progress, does not render that IEP inappropriate."  Carlisle Area Sch. Dist. v. Scott P., 62 F.3d 520, 530 (3d Cir. 1995).

Failure to adhere to a procedural requirement under the IDEA does not automatically constitute denial of a FAPE.  D.S. v. Bayonne Bd. of Educ., No. 08-1726, 2008 WL 4960055, at *8 (D.N.J. Nov. 19, 2008).  Plaintiffs bear the burden of showing that procedural irregularities resulted in a loss of educational opportunity for the student or meaningful participation in the IEP process for the parents.  C.M. v. Bd. of Educ. of Union County Reg'l High Sch. Dist., 128 Fed.Appx. 876, 881-82 (3d Cir. 2005); see also 20 U.S.C. § 1415(f)(3)(E)(ii); N.J.A.C. § 6A:14-2.7(k).

When the parents believe a child's IEP does not provide a FAPE as required by the IDEA, they may request a due process hearing or a mediation session.  See 20 U.S.C. § 1415(e)-(g); Lascari v. Bd. of Educ. of Ramapo Indian Hills Reg'l High Sch. Dist., 560 A.2d 1180, 1183-84 (N.J. 1989).  The party challenging

the IEP bears the burden of establishing its inadequacy.
Schaffer v. Weast, 546 U.S. 49, 62 (2005).

**B.   Review of ALJ's Decision**

The Court reviews administrative decisions regarding due
process proceedings pursuant to 20 U.S.C. § 1415(i), which
provides that the Court "(i) shall receive the records of the
administrative proceedings; (ii) shall hear additional evidence
at the request of a party; and (iii) basing its decision on the
preponderance of the evidence, shall grant such relief as the
court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).
Judicial review of the administrative decision is conducted as a
"modified de novo review" that gives "due weight" to the
underlying administrative proceedings.  S.H. v. State-Operated
Sch. Dist. of City of Newark, 336 F.3d 260, 270 (3d Cir. 2003).
However, the Court is "free to accept or reject the agency
findings depending on whether those findings are supported by the
new, expanded record and whether they are consistent with the
requirements of the [IDEA]."  Oberti v. Bd. of Educ., 995 F.2d
1204, 1220 (3d Cir. 1993).

The factual findings of the ALJ are considered prima facie
correct, and the "reviewing court is not to substitute its own
notions of sound educational policy for those of local school
authorities."  S.H., 336 F.3d at 270 (quotation omitted); see
also Oberti, 995 F.2d at 1219.  The reviewing court must "defer

to the hearing officer's findings based on credibility judgments unless the non-testimonial, intrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." S.H., 336 F.3d at 270 (quotation omitted).

## II.  Legal Standard Applied Here

### A.  Parties' Arguments

Plaintiffs seek a judgment declaring that the ALJ correctly concluded that H.R.'s educational programs for the 2007-08 and 2008-09 school years were not sufficient to confer some educational benefit on him.  (Pl. Br. at 13-14.)  In support of their contention that H.R.'s IEPs were insufficient, Plaintiffs contend that Defendant failed to provide H.R, "a student with dyslexia, with the type of reading program required; the District continued to provide [H.R.] with the same reading program, despite objective evidence that he was not making progress in it; and the program offered by the District did not incorporate the five essential components of reading as recommended by the National Reading Panel and No Child Left Behind Act."  (Pl. Br. at 21.)

In the alternative, Plaintiffs contend that the IEPs contained procedural violations so fundamental as to deprive H.R. of a FAPE, in that the IEPs lacked sufficient information as to H.R.'s present levels of educational performance, goals,

objectives, accommodations, and instructional strategies.  (Id. at 22.)

Defendant contends that the ALJ applied the wrong standard for determining whether Defendant provided a FAPE during the 2007-08 and 2008-09 school years, the ALJ's decision should be overturned to the extent it found Defendant did not provide a FAPE, and judgment that a FAPE was offered should be rendered in favor of Defendant.  (Def. Br. at 14, 21.)  Defendant argues that the ALJ's decision is "at odds with itself" in that it simultaneously found that H.R.'s IEPs were reasonably calculated to provide a FAPE, but that Defendant failed to provide H.R. with a FAPE.  (Def. Br. at 19.)  Defendant points out that the ALJ's only reasoning for ultimately finding that Defendant did not provide a FAPE was that H.R.'s progress was too slow, and states that this is not a legitimate criterion for decision under the IDEA.  (Def. Br. at 20-21.)  Finally, Defendant argues that the parents' due process petitions sought relief not available under the IDEA--specifically, the Wilson program taught with fidelity to design--because the IDEA prohibits parents from dictating educational methodology to schools.  (Id. at 22-25.)

**B.   Relevant Timeframe for Determining a FAPE**

The parties fundamentally disagree as to whether the ALJ applied an incorrect legal standard in determining that Defendant did not provide a FAPE because H.R.'s progress occurred too

slowly.  We find that the ALJ erred in reviewing the adequacy of
H.R.'s IEPs retrospectively, rather than prospectively.  "[T]he
measure and adequacy of an IEP can only be determined as of the
time it is offered to the student, and not at some later date."
Fuhrmann v. E. Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir.
1993).

Notably, the ALJ's finding that the IEPs "were sufficiently
reasonably calculated to provide H.R. with a free appropriate
public education in the least restrictive environment" is
consistent with the requirement that adequacy of an IEP is to be
measured prospectively.  (4-28-09 ALJ Decision at 22.)  "Evidence
of a student's later educational progress may only be considered
in determining whether the original IEP was reasonably calculated
to afford some educational benefit."  Fuhrmann, 993 F.2d at 1040.
With that standard in mind, we turn to the question of the
adequacy of the IEPs at the time they were offered.

**C.   Adequacy of 2007-08 and 2008-09 IEPs**

The ALJ found that the 2007-08 and 2008-09 IEPs were
reasonably calculated to provide H.R. a FAPE on the basis that
"H.R. would benefit from continuation of the Wilson [program]
methodology with flexibility and use of other methods to address
H.R.'s multiple deficiencies"; "Professor Ehrlich's reading plan
with oversight of H.R.'s teachers and H.R.'s progress would
benefit H.R.'s reading and writing progress"; the IEPs "included

16

goals; benchmarks; evaluation of the strengths, deficiencies and needs of H.R." as well as progress and testing methods; and because Defendant trained teachers (including H.R.'s teachers) in the Wilson program and implemented that system with H.R. after it had been proven helpful to him.  (4-28-09 ALJ Decision at 22.)

Based on these findings alone, the ALJ should have found that the IEPs conformed to the requirements of the IDEA that the IEPs be reasonably calculated to confer some educational benefit. This Court concurs with the ALJ's findings above, and notes that the record supports a finding that the IEPs were appropriate. The record shows that H.R. made progress in reading, earning quarterly grades of 79, 78, 78, and 79 in reading during his third grade year.  (Admin. R. at 780.)  His report card for fourth grade shows that he earned a grade of 88 in the first marking period.  (Admin. R. at 998.)  H.R.'s written classwork shows improvement in penmanship, spelling, and grammar.  (Admin. R. at 875-996.)

While Plaintiffs make much of Ms. Hennessey's testimony at the administrative hearings that H.R. regressed between second and fourth grade, based on his standardized test scores, the ALJ expressly rejected that opinion.  (Pl. Br. at 16-18; 4-28-09 ALJ Decision at 20.)  This Court concurs in the ALJ's rejection of Ms. Hennessey's opinion that H.R. has regressed, based on the academic work in the record and the testimony of his daily

educators.  See Rowley, 458 U.S. at 203 & 207 n.28 (noting that passing regular examinations and advancing to higher grade levels is indicative, though not dispositive, of receiving an educational benefit); Scott P., 62 F.3d at 530 (rejecting hearing officer's finding that student's academic achievement had merely been maintained as measured by standardized tests, because record contained ample evidence, such as teacher-constructed exams, showing academic improvement).

Plaintiffs objected to Defendant's use of Dr. Ehrlich's "Individualized Multi-sensory Reading Plan" for H.R. in the 2008-09 IEP.  Dr. Ehrlich's plan includes the following aspects:

I.     Administer an I.R.I., (Informal Reading Inventory) to assess individual strengths and weaknesses.
II.    Improve Interest and Motivation in Reading.
       A.  Sports Books
       B.  Magazines
       C.  Newspapers
III.   Develop Individualized Sight Word Program.
IV.    Pre-Introduce Subject based Vocabulary with Word Banks, Word Searches and Crossword Puzzles.
V.     Develop a free Reading Program Specifically for [H.R.].
VI.    Use of Pocket Tape Recorder to Reinforce Auditory Perceptual Skills.
VII.   Utilize "Books on Tape."
VIII.  Utilize Short, High Interest Guided Reading Materials to Develop Specific Comprehension Skills.
IX.    Incorporate Specific Elements of the Wilson Reading Program as Designated by the Wilson Trained Instructor, other Reading Modalities and input by the District's Outside Consultants.

(Admin. R. at 836-37.)  Dr. Ehrlich's plan was based in part on two observations of H.R.  Dr. Ehrlich observed H.R. during a school day in his special and mainstream education classes, during which he observed that H.R. "work[ed] well independently on writing and then solving a vocabulary work sheet," "responded correctly to orally presented questions and was highly motivated."  (Admin. R. at 1021.)  Dr. Ehrlich also noticed that H.R. "interacted well with the teacher and his peers," and "was able to maintain his focus throughout" the language arts lesson.  (Admin. R. at 1021.)  In contrast, Dr. Ehrlich also observed H.R. during an individual Wilson program lesson at his home.  (Admin. R. at 1021-22.)  Although the instructor was excellent, H.R. lacked motivation to complete the lesson, stating, "I hate reading" and "Can I stop now?"  (Admin. R. at 1022.)  Based on his observations, Dr. Ehrlich recommended a reading instruction program that includes a multi-sensory, multi-faced approach to learning.  (Id.)  The ALJ made the findings that H.R. "is more confident, happier and less frustrated in the resource room," and that "implementation of Professor Ehrlich's reading plan with oversight of H.R.'s teachers and H.R.'s progress would benefit H.R.'s reading and writing progress."  (4-28-09 ALJ Decision at 20, 22.)

    Plaintiffs contend that the plan designed for H.R. by Dr. Ehrlich does not provide a FAPE because Dr. Ehrlich did not

incorporate the "five essential components of reading as recommended by the National Reading Panel and No Child Left Behind Act." (Pl. Br. at 19.)  However, the No Child Left Behind Act does not alter the well-settled requirements of the IDEA. See Leighty v. Laurel Sch. Dist., 457 F.Supp.2d 546, 560-62 (W.D. Pa. 2006); see also Newark Parents Ass'n v. Newark Pub. Sch., 547 F.3d 199, 212-14 (3d Cir. 2008) (stating that No Child Left Behind Act does not create a private cause of action).

We find that the plaintiffs' challenge to the IEPs based on the fact that they do not require 1:1 instruction, using the Wilson program "taught with fidelity to design," that is, without deviation from its intended progression, amounts to an attempt to dictate educational methodology to Defendant.  Such an attempt is impermissible under the IDEA.  See Rowley, 458 U.S. at 207-08 (rejecting notion that courts can overturn a State's choice of appropriate educational theories in an IDEA proceeding and noting that "questions of methodology are for resolution by the States"); D.B. v. Ocean Twp. Bd. of Educ., 985 F.Supp. 457, 487 (D.N.J. 1997).  "Districts need not provide the optimal level of services, or even a level that would confer additional benefits, since the IEP required by IDEA requires only a 'basic floor of opportunity.'" Scott P., 62 F.3d at 533-34 (quoting Rowley, 458 U.S. at 201).

The ALJ found H.R.'s educators credible in their analyses and opinions that "different reading modalities are needed to address the multiple deficits of H.R."  (4-28-09 ALJ Decision at 23.)  We find that the record supports the ALJ's credibility determinations as to H.R.'s educators.  Based on the testimony of H.R.'s educators and a review of the record, we find that the 2007-08 and 2008-09 IEPs were reasonably calculated to confer an educational benefit.[4]

We note that in addition to the educational sufficiency of the IEPs, the ALJ credited H.R.'s teachers' testimony that the small group resource room replacement for language arts literacy had social and motivational benefits to H.R., which goes to the IDEA's requirement that a student be educated in the "least

---

[4] Plaintiffs' contention that the IEPs are inadequate because they did not change from year to year is equally unavailing.  (Pl. Br. at 21 ("[T]he District continued to provide [H.R.] with the same reading program, despite objective evidence that he was not making progress in it. . . .").)  See Scott P., 62 F.3d at 520 (failure to make progress in earlier IEP does not render either the first IEP or a subsequent IEP inappropriate); Fuhrmann, 993 F.2d at 1040.  Although the "annual measurable goals and benchmarks or short term objectives" remained identical for H.R.'s Specialized Reading Program in both the 2007-08 and 2008-09 IEPs, the record indicates that the goals of improving word analysis, vocabulary, comprehension, grammar, usage, mechanics, spelling, and composition remained relevant from one year to the next.  (Admin. R. at 199 (2007-08 Draft IEP), 317 (2007-08 IEP), 1033 (2008-09 IEP).)  The fact that the goals remained the same does not compel the inference that no progress occurred, in view of the evidence in the record indicating that H.R. did in fact make progress.

restrictive environment." (4-28-09 ALJ Decision at 20-21.) A small group resource room setting is less restrictive than 1:1 instruction, which would deprive H.R. of the social benefits and cooperative learning inherent in the regular classroom and resource room.

### D.   Procedural Requirements of the IDEA

Plaintiffs argue, in the alternative, that the IEPs offered by Defendant at issue here were so fundamentally flawed as to constitute a denial of a FAPE. (Pl. Br. at 22.) Plaintiffs contend that the 2007-08 and 2008-09 IEPs lacked specific information regarding H.R.'s present levels of educational performance, goals and objectives, accommodations, and instructional strategies. (Id.) They assert that the goals and objectives were too vague, the IEP did not specify accommodations such as books on tape that were actually utilized by H.R.'s educators, and while the IEPs called for a "specialized reading program," the IEPs did not specify the focus of that reading program. (Id. at 25-29.)

The ALJ found that the IEPs in question were procedurally adequate:

> I FIND that H.R. has made progress in the language arts literacy program. I FIND that H.R. would benefit from continuation of the Wilson methodology with flexibility and use of other methods to address H.R.'s multiple deficiencies. In addition, pursuant to the IEPs, H.R. should continue speech and occupational therapy as needed and [extended school year] reading tutoring. I

22

> FIND that implementation of Professor Ehrlich's reading
> plan with oversight of H.R.'s teachers and H.R.'s
> progress would benefit H.R.'s reading and writing
> progress.  I FIND that the IEPs included goals;
> benchmarks; evaluation of the strengths, deficiencies
> and needs of H.R.; progress and testing methods; and
> services.  Although more specificity and detail would
> be helpful, I FIND that the 2007-08 and 2008-09 IEPs
> were sufficiently reasonably calculated to provide H.R.
> with a free appropriate public education in the least
> restrictive environment.

(4-28-09 ALJ Decision at 22.)

For the reasons discussed above, the Court finds that
Plaintiffs have not shown that H.R.'s IEPs resulted in a loss of
educational opportunity, as they were reasonably calculated to
provide a FAPE and he did in fact make progress in language arts.
See D.S., 2008 WL 4960055, at *8-*9.  In addition, the IEPs are
sufficiently detailed in describing H.R.'s present levels of
educational performance, including reports of recent professional
evaluations and reports of his teachers and speech therapist.
(See Admin. R. at 188-89, 272-73, 307-08, 1021-23.)  We find that
the IEPs comport with the procedural requirements of the IDEA.
See 20 U.S.C. § 1414(d); 34 C.F.R. § 300.324; N.J.A.C. § 6A:14-
3.7.

The record does not support a finding that the parents were
deprived of meaningful participation, regardless of whether the
IEPs do not specify a particular specialized reading program.
Dr. Ehrlich's custom reading program for H.R. is not included in
the 2008-09 IEP because the parents rejected it when presented at

23

a June 19, 2008 meeting.  (4-28-09 ALJ Decision at 19.)  While it is clear that the parents disagreed with aspects of the 2007-08 and 2008-09 IEPs, they participated in several IEP meetings for each of those school years.  (See Admin. R. at 306 (parents present at 8-27-07 IEP meeting), 1020 (parent present at 6-19-08 IEP meeting).)  The record indicates that Plaintiffs and Defendant communicated about the details of H.R.'s reading program before the first due process petition was filed.  (Admin. R. at 335-37, 338-42, 344-45, 350, 356, 373, 375-76.)  One such letter advised the Plaintiffs, in response to their questions: "As stated in the IEP, H.R. will receive a multi-sensory reading program that will utilize techniques from the Wilson Reading Program and other multi-sensory programs."  (Admin. R. at 375, 10-2-07 Letter from Defendant to Plaintiffs' Counsel.)  These written communications indicate significant parental involvement. See M.S. v. Mullica Twp. Bd. of Educ., 485 F.Supp.2d 555, 570 (D.N.J. 2007); see also D.S., 2008 WL 4960055, at *8.

Plaintiffs' insistence that Defendant violated the procedural requirements of the IDEA by failing to identify a specific reading program, thus "den[ying] the parent[s] a role . . . in developing the IEP," erroneously presumes that the IDEA requires a school district to select and identify a specific commercial reading program or methodology, as opposed to developing an appropriate program in-house.  (Dkt. entry no. 37,

Pl. Reply Br. at 13-14.)   The Court declines to interpret either the IDEA or its implementing regulations as imposing such a burden on Defendant.   See <u>Allyson B. v. Montgomery County Intermed. Unit No. 23</u>, No. 07-2798, 2010 WL 1255925, at *11 (E.D. Pa. Mar. 31, 2010) ("[T]here is no requirement that the IEP include the curriculum."); <u>Greenwood v. Wissahickon Sch. Dist.</u>, 571 F.Supp.2d 654, 663 (E.D. Pa. 2008) ("Parents do not have a right to compel a school district to provide a specific program or employ a specific methodology in educating a student.").

### CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion for judgment on the pleadings below and deny Plaintiffs' cross motion for summary judgment in their favor.

The Court will issue an appropriate order and judgment separately.

<u>      s/ Mary L. Cooper      </u>
**MARY L. COOPER**
United States District Judge

Dated:    April 22, 2010